**Sarah F. THORPE, Plaintiff,**

**v.**

**Eugene B. GURCZENSKI, Defendant.**

Superior Court of Delaware,
New Castle.

June 25, 1969.

James P. D'Angelo, Wilmington, for plaintiff.

Richard I. G. Jones (of Prickett, Ward, Burt & Sanders), Wilmington, for defendant.

STIFTEL, President Judge.

On February 17, 1966, plaintiff and her daughter were involved in an automobile accident. They sued defendant. The jury returned a verdict for the defendant with respect to plaintiff's suit but awarded her daughter damages. Plaintiff subsequently sought and received a new trial. This time, the jury awarded her damages of $1000. Since the parties had stipulated $510 for medical expenses, only $490 of the verdict represented payment for pain and suffering and injuries. Plaintiff again seeks a new trial, claiming that the $490 awarded to her was grossly inadequate.

The amount of damages to be awarded to a plaintiff in an action for personal injuries is primarily a matter for the jury. It is only in the exceptional case that a new trial will be ordered. See, *Anno.*: "Adequacy of Damages", 16 A.L. R.2d 393, 401. The question, then, is whether this is the exceptional case.

Defendant relies on the testimony of Dr. Walter L. Bailey to defeat plaintiff's motion. He says it makes little difference

**560**

that the two physicians who testified on behalf of plaintiff gave evidence tending to sustain her claim of serious permanent injuries if there was testimony by Dr. Bailey indicating negligible injuries.

Dr. Bailey testified with respect to three different matters: (1) Plaintiff's complaints; (2) his findings upon examining her; and (3) his interpretation of the EMG test and x-ray upon which plaintiff's physicians had based certain of their testimony.

With respect to plaintiff's complaints, Dr. Bailey's testimony accorded essentially with that of the other physicians. Her complaints were not exactly the same on the three occasions he saw her but they were many and substantially the same; and he specifically negated the possibility that she was malingering.

Dr. Bailey found there was a sensation of "grating" on examination of her left knee. This grating occurred on motion of the knee. He found, however, that the reflexes of the left leg were normal and that there was an absence of muscular atrophy such as would have been present if plaintiff had favored this leg. This did not mean, however, that there was not pain in this leg and that such pain may have come from the hip region, nor is there any indication from his testimony that plaintiff's use of her leg was not normal merely because it buckled under her due to unsteadiness caused by the hip.

As to her left arm, Dr. Bailey also found it normal in reflexes and free of atrophy. Her arm complaints consisted of "numbness, cold and loss of grip". There is no indication that normal reflexes or absence of atrophy is inconsistent with this complaint. Also Dr. Bailey agreed with the other physicians regarding the lump in plaintiff's breast bone and the existence of a "demonstrable neck difficulty". Dr. Bailey felt that her permanency, if any, would be classified as minimal in this area.

As to the results of the EMG test, both plaintiff's physician-witnesses accepted at face value the results of this test, which indicated abnormality in her shoulder consistent with nerve root damage at the base of her neck. Dr. Bailey had the following to say about the test:

"Q. Doctor, there is evidence in this case and it is plaintiff's Exhibit No. 7, which is an EMG test from the Wilmington Medical Center and I ask you if you had an opportunity to see that and if you had, what significance do you attach to that?

"A. Well, it means that on the 18th of April, 1966, a certain person was abnormal. I think that to make any other similar test or medical tests—one test means very little. She should have confirmation of it by perhaps one or more. It tends to change. It is not an unusual finding actually.

\*    \*    \*    \*    \*    \*

"Q. Doctor, what significance does the EMG reading shows an abnormal bilateral in the CAT 1 nerve root area?

"A. It means that at the time this EMG was taken there was some irritation of the nerve root in that area.

"Q. What manifestation would that reflect in respect to her left upper extremity?

"A. Well, this is like all other electrical tests. You have to put this together with your examination and how the patient complains and so forth. This is the lower part of the group of nerves that go to the arm and forearm and hand.

"Q. What I am driving at is with the numbness in the hand, would that be consistent, or not?

"A. Not with the entire hand.

"Q. Fingers?

"A. Yes, specifically the fourth and fifth.

"Q. Mrs. Thorpe is not a malingerer in your opinion, is she?

"A. No."

In so testifying, Dr. Bailey expressed, at most, his reluctance, on the basis of one admittedly abnormal EMG reading, to conclude that plaintiff's nerve roots were injured. He thus disputed the weight given by the other physicians to the test; but he did not question the sincerity of plaintiff's complaints; nor did he challenge the ultimate diagnosis reached by the other physicians based, not on the EMG test alone, but also on their greater familiarity with the plaintiff's injuries through extensive examinations and prolonged treatment.[1]

The other of plaintiff's major complaints is a weakened left hip and leg. Both physicians testifying in her behalf relied on an x-ray of her hip which they interpreted as revealing a partially knit fracture. Dr. Bailey testified as follows in regard to this X-ray:

"A. * * *

I think to say that it represents a fracture from that single film is perhaps pushing things a bit. I think additional x-rays are in order and should be taken before this could be interpreted positively as being a fracture.

"Q. Based on that x-ray, would you say this is or is not a fracture?

"A. Is not.

"Q. Doctor, what do you think it is?

"A. It is simply a line secondary to muscle, a muscle plane, I think it is a normal finding.

"Q. Your interpretation of that x-ray would be that there is nothing wrong about it?

"A. My interpretation is that you should have additional x-rays.

*   *   *   *   *   *

"Q. She has complaints in the hip area, doesn't she?

"A. She has complaints in her pelvic area actually.

"Q. Are they the same place as this x-ray shows this fracture?

"A. No.

"Q. She never complained to you at least about this area?

"A. No, never."

Again, Dr. Bailey expressed his reluctance to attribute the same importance to the x-ray as did the other physicians. He did not say plaintiff had no hip or pelvic injury; he merely questioned whether, on the basis of one x-ray, the cause of her difficulties could be assigned to an alleged partially knit fracture in an area slightly removed from the location of her complaints.

█ The main dispute between plaintiff's physicians and Dr. Bailey reduces, as mentioned above, to the degree of permanency. By accepting the EMG and the x-ray, plaintiff's physicians concluded that plaintiff's permanency was mild to moderately severe, whereas Dr. Bailey felt that her permanency could be minimal, at best. However, this dispute over the EMG and the x-ray does not change the fact that plaintiff suffered for an extended period of time from multiple injuries and that before she visited Dr. Bailey she had at least ten visits with Dr. Russo. She also visited Dr. Russo after the accident on twenty more occasions. There is no doubt that immediately after the accident she had pronounced bruises,[2] which remained with her

---

[1]. For example, plaintiff's treating physician testified that in moving her arm about with his hand on her shoulder he could detect involuntary muscle spasms such as indicated an injury.

[2]. Dr. Russo (Tr. p. 15):
"A. I saw her on the 21st of February, 1966. At that time she was suffering from a severe contusion of her left hip, left breast, left arm, forearm, left wrist, and hand, both knees and the neck. * * *".

for a long time. She also had several visits with Dr. Leroy, a neurosurgeon, and underwent his prescribed treatment; she made many visits to the curative workshop and also to Dr. Strange, the orthopedic surgeon. Unquestionably, the doctors disagree as to her injuries and the extent thereof. However, this woman, having been in a severe accident and having suffered multiple bruises and injuries as a consequence, is entitled to adequate compensation after the jury determined that defendant's negligence proximately caused these injuries. Four hundred and ninety dollars is grossly inadequate, even when the testimony is considered in the best light for the defendant. This being that exceptional case that requires action by the Court, a new trial is ordered.

■ Plaintiff argues that the new trial should be on the issue of damages only since the jury resolved the issue of liability. I cannot agree. The circumstances surrounding this case indicate that justice would best be served by having a new trial on the issue of liability as well. The jury in the first trial found for the defendant. The jury in this trial submitted a note to the Court requesting instruction as to whether they could award the plaintiff damages if they found her contributorily negligent and then returned their verdict before the Court could answer the question. Sometimes, the smallness of the verdict for a plaintiff may be a reflection of the weakness of plaintiff's case as to liability. It is possible that the weakness of the proof on liability may have been allowed to weigh against the proof of damages. It is even possible that sympathy was engendered by proof of serious injuries which may have supplemented a weak proof of liability. Since the inadequacy of the award in this case raises the possibility of a compromise verdict, Bennett v. Andree, Supr., 252 A.2d 100, a new trial on all the issues is necessary.

It is so ordered.